**In the United States District Court
for the District of Kansas**

———————

Case No. 5:21-cr-40026-TC

———————

UNITED STATES OF AMERICA

v.

JOSE CARLOS LOPEZ, ET AL.

———————

**MEMORANDUM AND ORDER**

Defendants Jose Carlos Lopez and Ismael Cobos Bautista were stopped by Kansas Highway Patrol (KHP) while traveling on Interstate 70. During the encounter, Troopers Dylan Frantz and Chandler Rule conducted a K9 sniff of Defendants' minivan and found, among other things, over 110 pounds of methamphetamine. Following their arrest, Defendants moved to suppress the drug evidence, arguing that the troopers violated the Fourth Amendment. Docs. 33 & 34. Defendants also filed a Joint Motion to Compel Discovery for all of the KHP's data on Frantz's EPIC-level drug seizures.[1] Doc. 47. For the following reasons, the motions are denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

---

[1] EPIC stands for El Paso Intelligence Center, which monitors travel and transport across the country and provides information to law enforcement agencies to assist with drug, weapon, and alien-smuggling investigations. *See United States v. Carbajal-Iriarte*, 586 F.3d 795, 797 & n.1 (10th Cir. 2009). "EPIC-level" is the term Trooper Frantz used to describe seizures involving a pound or more of narcotics or over $10,000 in currency. Doc. 46 at 17 (Tr. Mot. to Suppress Hr'g).

1

unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures—of people or their personal property—are presumed unreasonable without a warrant. *Id.*; *United States v. Karo*, 468 U.S. 705, 717 (1984). But there are several exceptions. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing examples). Thus, for warrantless searches or seizures, the Government may rebut the presumption of unreasonableness by showing that an exception to the warrant requirement applies. *Id.* at 403. So while it is the defendant's burden to show the Fourth Amendment is implicated, once he carries that burden, the Government must prove the conduct in question was reasonable. *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020).

If a search or seizure violates the Constitution, the exclusionary rule, when it applies, forbids the use of improperly obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). The rule applies only where it "result[s] in appreciable deterrence" for law enforcement. *Id.* at 141 (alteration in original) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Thus, suppression is not "an automatic consequence of a Fourth Amendment violation." *Id.* at 137.

**B**

On January 25, 2021, KHP Trooper Dylan Frantz stopped a blue 2020 Chrysler Pacifica minivan in Wabaunsee County, Kansas. Doc. 33 at 1–2. Frantz first saw the van while he was parked in the median of Interstate 70 monitoring traffic. Doc. 41 at 2. Frantz observed several things as the van passed: it decreased its speed from 70 miles-per-hour to 65 in a 75 miles-per-hour zone, it had a radar detector attached to the front windshield, and it did not have its headlights on despite the on-and-off mixture of snow and rain. *Id.* Frantz followed the van eastbound without activating his lights or sirens. *Id.* While following, Frantz noticed the van drifting in its lane and driving onto the center line two separate times, each for a second or two. Doc. 33 at 2; Doc. 41 at 2. Frantz did not observe anything in the roadway that would have caused the van to drift. Doc. 41 at 2. He also saw that the van's windshield wipers ran continuously for several seconds even though its headlights were not illuminated as required. *See* K.S.A. 8-1703(a)(3) (requiring use of headlights any time that wipers are in continuous use due to weather).

Concerned that the driver might be impaired or tired, Frantz pulled the van over to investigate. Doc. 41 at 2–3. He observed that it took the van about 30 seconds to come to a stop on the side of the road, a

2

longer than usual time. *Id.* at 3. Frantz testified that this delay in pulling over was itself suspicious, as it is "something I've seen consistent with people that are deciding if they're going to flee the scene or worried about what's going to happen once they're stopped." Doc. 46 at 38–39 (Tr. Mot. to Suppress Hr'g).

Frantz approached the van and informed the two occupants that he pulled them over for failing to maintain a lane and failing to have headlights illuminated. Doc. 33 at 2; Doc. 41 at 3. He asked them if everything was alright and if they were getting tired. Doc. 41 at 3; Doc. 46 at 48. He also asked for their identification and confirmed that Bautista was the driver and Lopez the passenger. Doc. 41 at 3. Lopez said they were traveling from Los Angeles to Kansas City to visit his sick grandmother. *Id.*

While talking with the occupants, Frantz noticed they seemed uneasy. Doc. 41 at 3. He observed Bautista "looking straight ahead and rubbing his hands on his legs" and Lopez pausing before he answered questions about their trip. Doc. 46 at 50–51. Frantz also noticed that the two seemed hesitant about who should answer his questions and that eventually Lopez took over in responding. *Id.* at 49–50. Furthermore, Frantz observed that the Defendants did not seem to calm down as the encounter wore on. *See id.* at 50–51. Frantz also noticed that the vehicle had a "lived-in appearance." Doc. 41 at 3. Food wrappers and empty drinks were scattered throughout, and the second-row seats were laid back with blankets on either side. *Id.* To Frantz, it looked like they had been sleeping in the minivan, which is consistent with smuggling activity. Doc. 46 at 45–47 ("[P]eople traveling across the country that are involved in criminal activity . . . . They'll just live out of the vehicle or won't leave the vehicle that they're operating.").

Frantz asked for the vehicle rental agreement. Doc. 41 at 3. Lopez did not have the agreement handy and had to search his phone for it. Doc. 33 at 2–3; Doc. 41 at 3–4. As Lopez searched, Frantz asked them to drive their vehicle to the next exit because they were stopped too closely behind a parked semi-truck. Doc. 33 at 2–3. As he followed them to the next exit, Frantz called dispatch to run license checks on Lopez and Bautista. *Id.* at 3. At the next exit, Trooper Chandler Rule arrived. *Id.*; Doc. 41 at 4. Frantz told Rule why he pulled the van over and what he learned from his brief conversation. Frantz asked Rule to check whether Lopez found his rental agreement. Doc. 33 at 3; Doc. 41 at 4.

3

By the time Rule arrived at the vehicle, the pair had located the rental agreement. Upon inspection, Rule noticed that the agreement was for a different vehicle. Doc. 46 at 122. Lopez then showed him the correct agreement. *Id.* Rule noted that the vehicle had been rented two days before in Southern California and was due back there on January 25, the very day of the traffic stop. Doc. 41 at 4. When asked about the short rental, Lopez explained that he initially rented the vehicle for two days because that was all he could afford. *Id.* Lopez claimed that he had just extended the rental before being pulled over. *Id.* Rule also observed that both Lopez and Bautista appeared extremely nervous during this exchange. *Id.* Bautista avoided eye contact with Rule, while Lopez fidgeted in his seat. *Id.*

The two officers then conferred back at their vehicles. Doc. 33 at 3. During this time, they opined that the two men "don't look like cousins," and that they "have different names," and lived "30 minutes apart." *Id.* While conferring, dispatch reported back: each had a valid license and a criminal history of drug distribution. *Id.*; Doc. 41 at 4. Both were on federal probation for the distribution of narcotics. Doc. 33 at 4; Doc. 41 at 4. Neither had outstanding arrest warrants. Doc. 33 at 4–5.

Frantz walked back to the van, returned Lopez and Bautista's documents, and issued a warning for the traffic infractions. With a wave, he said, "You guys are good." Ex. 1 at 15:42 (dash cam video). As he turned back to his patrol car, Lopez told Frantz that he and Bautista had planned to take the next exit to eat at Subway but did not do so while being followed because they did not want to look suspicious. Doc. 41 at 4. Frantz thought this was suspicious. Doc. 46 at 98. Still, Frantz told them to "take care" and walked in the direction of his patrol car. Doc. 33 at 4; Doc. 41 at 5. But Frantz did not make it to his car. Rather, after taking six steps to a point just past the rear of the van, he turned around, and reapproached the passenger window. Doc. 41 at 5. This "two-step" maneuver took only a few seconds. Doc. 33 at 5. The van had not moved. *Id.*

In a conversational tone, Frantz said, "Can I ask you guys some questions?" and then, "Can I speak with you?" Ex. 1 at 16:18. Lopez said, "Yeah, sure," and Frantz began to ask about their trip to Kansas City, their relationship to one another, their occupations, and their rental agreement details. This exchange, with Frantz asking questions and Lopez answering, continued for about three minutes.

4

The conversation then shifted to Lopez and Bautista's criminal histories and whether there was anything illegal in the van. Frantz asked whether they had any drugs, weapons, or large amounts of money. The two denied having any contraband. Frantz also asked if they had any criminal history, and the two responded that they had been in trouble but only for personal use of cocaine.

Then Frantz asked if he could search the vehicle. Ex. 1 at 19:58. Lopez responded, "Do you have a problem with us?" and asked Frantz if he wanted to search for illegal drugs. Frantz said yes and again asked if there were illegal drugs in the vehicle. Lopez and Bautista denied using drugs. After asking several times whether he could search the van, Frantz finally said in a raised voice, "Hey! It's yes or no. Can I search the vehicle?" Lopez asked for clarification: "You just told us to go"; "Wow, you're confusing me"; and "Are we good to go, no?" Ex. 1 at 20:36–20:56; *see also* Doc. 33 at 8; Doc. 41 at 5. Lopez and Bautista never directly answered Frantz's question about searching the vehicle.

The parties dispute what happened next. Lopez claims that Frantz informed them that they were "being detained for a K9 because I believe you are involved in a criminal activity." Doc. 33 at 8. According to the Government, Frantz *asked* Lopez and Bautista if they would consent to a K9 sniff, and Lopez did. Doc. 41 at 6. The dash cam video indicates that Frantz did ask if Defendants would consent to the dog sniff. Ex. 1 at 21:01. And Lopez's response—"Yeah, sure"—is faintly audible. *Id.* at 21:05. Lopez and Bautista were then ordered out of the van and told they were being detained for a K9 sniff. Lopez stated, "You can search it, it's no big deal, but I just wanted to know why." Doc. 33 at 9; Doc. 41 at 6.

Rule deployed his K9 near the van. The dog alerted at the back of the van. Doc. 33 at 9; Doc. 41 at 6. After the dog alerted, the officers searched the vehicle. Doc. 33 at 9; Doc. 41 at 6. Frantz found a black book bag containing eight kilo-sized, vacuum-sealed packages of suspected heroin or fentanyl. Doc. 41 at 6. The officers also found three duffel bags full of roughly 110 pounds of methamphetamine and other drugs. *Id.* at 6. Lopez and Bautista were arrested and charged with drug offenses.

## C

All told, Lopez and Bautista have filed two motions. One is a motion to suppress, and an evidentiary hearing was held over two days.

5

Docs. 44 & 54. Both troopers testified. *See* Docs. 46 & 55. The other motion, filed between the two days of hearings, seeks to compel discovery. Doc. 47.

In the motion to suppress, Lopez and Bautista argue the troopers' search and seizures violated the Fourth Amendment for three principal reasons. Docs. 33 & 34. First, they argue that the initial traffic stop was unreasonable because Frantz did not have probable cause to believe a traffic violation occurred. Second, even if the initial stop was reasonable, they contend that it was unlawfully prolonged by Frantz's "two-step" tactic. Third, they argue that any consent to search the vehicle was not voluntary.

The Government argues that the initial stop was reasonable because Frantz had reasonable suspicion of a traffic violation. After the initial stop and Frantz's two-step, the Government contends that the conversation was consensual, so there was no unlawful, prolonged detention. And during that consensual encounter, the Government claims, Lopez further consented to a search of the van. Alternatively, the Government argues that Frantz had developed reasonable suspicion to detain the vehicle and deploy a K9 search.

In the motion to compel discovery, Defendants seek additional disclosure of KHP data for all of Frantz's EPIC-level seizures. Doc. 47 at 1–2. Specifically they seek:

 a. the date of the traffic stop and seizure;
 b. the state of registration/license plate of the vehicle stopped and from which the EPIC level seizure was made;
 c. the state or origin of the person(s) arrested, as documented by the state that issued a driver license to the person(s) arrested; and
 d. the name, race, and ethnicity of the person(s) arrested.

*Id.* at 2. Defendants want this data because at the evidentiary hearing Frantz's testified "extensively about his training and experience as a KHP Trooper." *Id.* at 2–3. Among their authorities, Defendants cite the Pretrial and Case Management Order, Doc. 25, and the Fifth and Sixth Amendments. Doc. 47 at 1. But the essence of their argument focuses on Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny. *See* Doc. 47 at 4–8. Against this, the

Government argues that it does not intend to present the sought-after data in its case-in-chief at trial and that the data is not material to preparing a defense. Doc. 52 at 6.

## II

Defendants' Joint Motion to Compel Discovery is denied because they have not carried their burden to show that the data sought is material to their defense or to impeaching Frantz's testimony. Instead, Defendants speculate, without offering any facts in support, that the data will undermine Frantz's credibility about his experience with EPIC-level drug seizures.

Under Fed. R. Crim. P. 16(a)(1)(E), an item is discoverable if it is "within the government's possession, custody, or control and . . . the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial." But Rule 16 does not authorize "a blanket request to see the prosecution's file," nor may a defendant use the rule to engage in a "fishing expedition." *United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)). The defendant bears the burden to make a prima facie showing of materiality. *United States v. Simpson*, 845 F.3d 1039, 1056 (10th Cir. 2017). "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990).

Defendants also cite *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Still, *Brady* and its progeny "require[] disclosure only of evidence that is both *favorable* to the accused and *material* either to guilt or to punishment." *United States v. Bagley*, 473 U.S. 667, 675 (1985) (quoting *Brady*, 373 U.S. at 87) (emphasis added) (internal quotations marks omitted).

Defendants have not carried their burden under Rule 16 or *Brady*. In arguing under Rule 16, Defendants allege that the data is material to their defense because the Government "spent considerable time" at the suppression hearing asking Frantz about his training and experience, including his EPIC-level seizures. Doc. 47 at 6. Thus, Defendants argue, Frantz' credibility is "squarely at issue," and the data underlying his testimony will assist their impeachment or rebuttal efforts. *Id.* But Defendants have not made a prima facie case for materiality. Instead, they merely assert that they "don't take as a given that Frantz's

testimony about his [experience is] accurate" and that his testimony is "likely belied" by the KHP data. Doc. 47 at 6–7. Despite that assertion, Defendants have not offered any facts suggesting that there is a "strong indication" that the KHP data "will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." *United States v. Garcia*, No. 20-1370, 2021 WL 53198, at *1 (D.N.M. Jan. 6, 2021) (alteration in original) (quoting *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996)). And without specific facts suggesting materiality, Defendants' assertions are merely speculative, which is not enough. *See United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994) ("The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."); *Case v. Hatch*, 731 F.3d 1015, 1041 (10th Cir. 2013) ("For *Brady* purposes, exculpatory evidence cannot be purely speculative."); *cf. United States v. Garcia-Martinez,* 730 F. App'x 665, 674 (10th Cir. 2018) ("To justify a court undertaking an *in camera* review for *Brady* material, at the very least, a defendant must make a 'plausible showing' that the government files at issue contain 'material' exculpatory or impeachment information.").

### III

Lopez and Bautista's motion to suppress is denied because Frantz had reasonable suspicion to detain them to conduct a K9 sniff of the van.[2] The initial traffic stop was valid. During the initial stop—before the "two-step" maneuver—Trooper Frantz developed reasonable suspicion to detain Lopez and Bautista for a K9 sniff. And even if there was not reasonable suspicion by the end of the initial stop, reasonable suspicion developed during the subsequent, consensual encounter that followed the two-step.[3]

---

[2] Bautista moved to join Lopez's motion to suppress. Doc. 34. The Government disputes Bautista's standing to raise a Fourth Amendment challenge because he did not have a reasonable expectation in the van (which Lopez rented) and because Bautista cannot show that the drugs would not have been found but for his, and only his, unlawful seizure. Doc. 41 at 30. Because the motion to suppress fails regardless, the Court need not address this issue.

[3] Having found the search was justified on other grounds, there is no need to determine whether Trooper Frantz's repeated requests for permission to search the vehicle satisfies the standard of consent.

### A

The initial stop was valid. Based on the totality of circumstances, Frantz had reasonable suspicion that the van's driver violated K.S.A. 8-1703(a)(3) and was driving while distracted or impaired.[4]

A traffic stop is a seizure for Fourth Amendment purposes. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). Warrantless traffic stops are valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). "Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors, *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."[5] *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted).

The analysis is an objective one. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). The officer's subjective motivation is irrelevant. *Id.*; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.").

---

[4] Defendants also challenge Frantz's reasonable suspicion to stop the van for possible violation of K.S.A. 8-1522(a) (failure to maintain lane). But because Frantz had independent reasonable suspicion that the driver violated K.S.A. 8-1703(a)(3) and was driving while impaired, that issue is immaterial to the analysis.

[5] Thus, Defendants are incorrect in arguing that probable cause is the applicable standard. *Contra* Doc. 33 at 9; Doc. 43 at 2–4. Probable cause is sufficient, but not necessary, for a traffic stop.

That said, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Arvizu*, 534 U.S. at 273.

Here, Frantz had reasonable suspicion of at least two different violations based on his direct observations. First, Frantz had reasonable suspicion that Lopez violated K.S.A. § 8-1703(a)(3). That statute requires that vehicles must "display lighted head and other lamps" while driving on the highway "when windshield wipers are in continuous use as a result of rain, sleet or snow." *Id.* Frantz observed the Pacifica's wipers being used continuously due to the rainy conditions. He testified that it was "more of a freezing rain or sleet, on and off snow." Doc. 46 at 29. Although the wipers appeared to be continuously activated, Franz did not observe illuminated taillights—which would be expected if the headlights were on. Doc. 41 at 14.

Lopez argues Frantz did not have reasonable suspicion because there was only a "slight drizzle of rain" not a "downpour." Doc. 33 at 12. Lopez admits that based on the video, "the precipitation appears to increase as they travel," but still disputes the need to illuminate his headlights because "it never increased to a high level or constant rain, sleet, or snow." Doc. 43 at 7. Contrary to Lopez's argument, K.S.A. § 8-1703(a)(3) does not require a "downpour" before vehicles in Kansas must turn on their headlights. Instead, according to the unambiguous language of K.S.A. § 8-1703(a)(3), Frantz's observation of the Pacifica operating its wipers continuously for several seconds without using its headlights was enough to provide reasonable suspicion that the driver was in violation of K.S.A. § 8-1703(a)(3). *See* Doc. 41 at 2.

Second, Frantz had reasonable suspicion that Lopez was driving while impaired or distracted. Reasonable suspicion of driving while impaired, sleepy, or intoxicated can warrant an investigative traffic stop. *United States v. Tang*, 332 F. App'x 446, 452 (10th Cir. 2009); *see also United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999). A vehicle's repeated weaving within its own lane can give rise to reasonable suspicion to believe that its driver is impaired. *State v. Field*, 847 P.2d 1280, 1285 (Kan. 1993). And importantly, an officer need not "actually observe a traffic violation being committed" for reasonable suspicion. *Id.* Here, Frantz testified that he observed the van drift onto the center line twice, which "raised my suspicion as if the driver may be tired or on their phone texting or potentially under the influence." Doc. 46 at 30. He found it "concerning" that at one point the van drifted onto the center line as another vehicle passed beside it. *Id.* at 31. He also

testified that he did not see any issues with the roadway that would cause the van to drift. *Id.* at 32–33. These behaviors, Frantz noted, are consistent with what he has seen in impaired or distracted drivers. *Id.* at 49. Finally, Frantz observed other behaviors in addition to the van's drifting: Defendants' decrease in speed to well-below the speed limit and their unilluminated headlights on a cloudy day with snow and rain. Doc. 41 at 2. Taken together this is a sufficient basis for reasonable suspicion of impaired driving.

Defendants counter that Frantz lacked reasonable suspicion because Defendants' driving did not measure up to the "far worse" driving in cases where the Tenth Circuit upheld findings of reasonable suspicion of impaired driving. Doc. 43 at 6–7 (distinguishing *United States v. Langel*, 269 F. App'x. 787 (2008)). Yet Defendants ignore Kansas and Tenth Circuit precedent recognizing reasonable suspicion for less-erratic driving behavior. *See, e.g.*, *Field*, 847 P.2d at 1285 (weaving within lane); *Ozbirn*, 189 F.3d at 1199 (drifting onto the shoulder twice within a quarter mile without any adverse circumstances); *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (crossing the center line and the shoulder line); *United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995) (swerving from the outside lane, straddling the center line, and swerving back to the outside lane).

Based on the totality of the circumstances, the government has satisfied its burden of proving that Frantz had reasonable suspicion that the van's driver violated K.S.A. § 8-1522(a) and was driving while distracted or impaired. *See United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) ("The government bears the burden of proving reasonable suspicion."). As a result, Trooper Frantz's initial traffic stop was valid.[6]

---

[6] Furthermore, the stop remained valid through Frantz's questioning and his issuance of the warnings. "It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings." *Pettit*, 785 F.3d at 1379. An officer may also inquire about the driver's travel plans and ask about matters unrelated to the stop. *Id.* (citing *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); *Muehler v. Mena*, 544 U.S. 93, 101 (2005)). Here, the initial traffic stop was routine: the officers asked for identification, ran license and background checks, asked about travel plans, returned identification, and issued warnings.

## B

By the end of the initial stop, Trooper Frantz had developed reasonable suspicion that Lopez and Bautista were involved in drug trafficking.[7] This reasonable suspicion justified detaining Lopez and Bautista for a K9 sniff of the van. And once the dog alerted to the presence of narcotics, the troopers had probable cause to search the van's interior. *United States v. Kitchell*, 653 F.3d 1206, 1222 (10th Cir. 2011) (recognizing the "well-established principle that a positive alert from a reliable narcotics-detection dog gives rise to probable cause to search a vehicle").

Again, reasonable suspicion is a deferential standard, only requiring that an officer have a "particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Navarette*, 572 U.S. at 396–97. Whether or not the government has satisfied its burden is judged by "the officer's conduct in light of common sense and ordinary human experience." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)). Courts consider "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996) (internal quotation marks omitted). Evidence is weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," keeping in mind that officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that "might well elude an untrained person." *Cortez*, 449 U.S. at 418.

Based on the totality of the circumstances, Frantz developed reasonable suspicion of drug trafficking during the initial encounter, which warranted the K9 sniff. His observations, combined with his experience with drug trafficking crimes and seizures, support this

---

[7] Frantz testified that by the end of the initial conversation he believed he had reasonable suspicion to conduct a search. One may reasonably question that testimony, given his subsequent attempts to obtain consent. But that potential inconsistency is immaterial because the law does not consider whether Frantz subjectively believed he had reasonable suspicion; the analysis is an *objective* one. If the circumstances of which he was aware would have led a reasonable officer to develop the requisite suspicion, a dog sniff is permissible. *See United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

finding. In particular, Frantz considered Defendants' slowing down and driving 10 miles-per-hour below the speed limit, their taking an unusually long time to pull over, their inconsistent and uncertain travel plans, their nervousness and hesitation answering simple questions, their criminal histories with drug trafficking, the van's lived-in appearance consistent with the "hard travel" often employed by drug couriers, *see* Doc. 46 at 46–47, Lopez's statement that the two did not want to exit while Frantz was following them because they did not want to appear suspicious, *see* Doc. 46 at 60, 98, and the radar detector in their rental car.

Many of these same observations have featured in Tenth Circuit opinions finding reasonable suspicion to conduct a search. For instance, the Tenth Circuit has consistently held that implausible travel plans can contribute to reasonable suspicion. *Pettit*, 785 F.3d at 1381; *see also United States v. Santos*, 403 F.3d 1120, 1130–32 (10th Cir. 2005) (finding that inconsistent, vague, or evasive answers regarding travel plans contributed to reasonable suspicion). Even if implausible travel plans can be consistent with innocent travel, they may still contribute to reasonable suspicion when taken together with other factors. *Sokolow*, 490 U.S. 1, 9–10. Here, Rule had learned that the rented van was originally due back in California that very day, but Defendants had extended the agreement right before the traffic stop. Doc. 46 at 57. Further, Rule noted that Lopez had claimed that he renewed the rental agreement just before being pulled over but provided no proof. Doc. 46 at 124. Rule testified that he "believed [Lopez] . . . wasn't being truthful about the rental agreement" and that it was "weird . . . that they had traveled all the way from LA . . . to where they were at now and just now began worrying about extending the rental agreement." *Id.* Rule shared this information with Frantz. These observations about Defendants' travel plans contributed to Frantz's reasonable suspicion of criminal activity.

So too with criminal history. "[I]n conjunction with other factors, [it] contributes powerfully to the reasonable suspicion calculus." *Simpson*, 609 F.3d at 1147. During his initial encounter with Lopez and Bautista, Frantz learned that both Bautista and Lopez had criminal histories involving drug distribution and were both on federal probation for distribution of narcotics. Doc. 41 at 4. This information weighs heavily in favor of reasonable suspicion when combined with the troopers' other observations consistent with drug trafficking. *See Simpson*, 609 F.3d at 1147.

13

"Unusual signs of nervousness" may also contribute to reasonable suspicion. *United States v. Davis*, 635 F.3d 1281, 1291–92 (10th Cir. 2011); *see also United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) (finding that "extreme and continued nervousness" can contribute to reasonable suspicion). Here, both troopers observed sustained nervousness by both Defendants. Frantz observed Bautista "looking straight ahead and rubbing his hands on his legs" and Lopez pausing before he answered questions about their trip. Doc. 46 at 50–51. Frantz also noticed that the two seemed hesitant about who should answer his questions and that eventually Lopez took over. *Id.* at 49–50. Frantz noted that in his experience, the "normal motoring public will start to calm down" throughout the interaction. *Id.* at 50. Instead, as Rule testified, Lopez and Bautista appeared "extremely nervous" during the subsequent questioning about the rental agreement. *Id.* at 125. Together and in conjunction with the other factors, these observations contributed to reasonable suspicion. Indeed, there is no reason to "ignore" Defendants' nervousness "in reviewing the totality of the circumstances." *Williams*, 271 F.3d at 1269.

Finally, a radar detector in a defendant's vehicle can also contribute to the calculus. *See United States v. Lyons*, 510 F.3d 1225, 1237 (10th Cir. 2007); *but see United States v. Stewart-Poppelsdorf*, 120 F. App'x 230, 233 (10th Cir. 2004) (indicating a radar detector, without evidence tying it to drug trafficking, is, at best, an indication of an intent to speed). Not only did Frantz notice a radar detector fixed to the windshield, Doc. 41 at 3, but he noted that it would have been deliberately put there because "it's not standard practice that the [rental] vehicle has an affixed radar detector in it," Doc. 46 at 47. He testified that people involved in criminal activity have told him that they use radar detectors to alert them to law enforcement presence. *Id.*

That is not to say that the circumstances or even those things that Trooper Frantz credited pointed only one way. Many of the factors that Trooper Frantz mentioned as part of his reasonable suspicion determination are not accretive to the reasonable suspicion finding in this Order. For example, many of the things he identified seem unremarkable, such as the food wrappers. *See United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("Remnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways."). Likewise, Frantz's disbelief that the two were cousins because they did not live in the same city, were over ten years apart in age, and had different names deserves no weight and is indicative of post-hoc

rationalization or unjustified hunches that are forbidden. These are unremarkable facts and "entirely consistent with innocent travel such that, in the absence of contradictory information, [they] cannot reasonably be said to give rise to suspicion of criminal activity." *Id.* Although the totality-of-the-circumstances analysis is holistic and not a piece-by-piece inquiry, these facts are so ordinary and "so innocent or susceptible to varying interpretations as to be innocuous." *See United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (quoting *Wood*, 106 F.3d at 946). Nevertheless, Frantz's consideration of these unpersuasive factors does not negate the otherwise valid bases for his objectively reasonable suspicion.

Defendants argument against reasonable suspicion—through a "divide-and-conquer" analysis that seeks to view each facet of the encounter in isolation—is unavailing. *Contra* Doc. 43 at 13–17. Courts are "not [to] examine each factor adding up to reasonable suspicion individually," but should "evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct." *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007); *see also United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994) ("Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious."). The law requires looking at each nuance of the encounter as part of a larger mosaic to determine whether the "whole picture" suggests that criminal behavior may be afoot. *Cortez*, 449 U.S. at 418.

Thus, based on the totality of the circumstances, Frantz had reasonable suspicion of drug trafficking that warranted a prolonged detention after the initial traffic stop and a K9 sniff. That he immediately chose to reengage Lopez and Bautista in a consensual manner does not negate his suspicion.

### C

Even if Frantz did not have reasonable suspicion at the end of the initial stop, the post-"two-step" encounter was consensual. And during that conversation, Frantz observed additional behavior that, when combined with his earlier observations, gave rise to reasonable suspicion that Defendants were involved in criminal drug activity.

**1.** Lopez argues that the traffic stop became an unlawful detention after Frantz performed the "two-step" by walking away from Lopez's window only to turn around and ask additional questions. Doc. 33 at

15

13–14. Once a traffic stop is completed, questions unrelated to the initial traffic stop are impermissible unless: "(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention becomes a consensual encounter." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (citations omitted); *see also Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Consensual encounters involve the voluntary cooperation of a private citizen in response to noncoercive questioning by law enforcement. *Mercado-Gracia*, 989 F.3d at 836. Whether an encounter is consensual depends on "whether a reasonable person under the circumstances would believe [he] was free to leave or disregard the officer's request for information." *Id.* (quoting *United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020)) (internal quotation marks omitted). This inquiry considers factors like the location of the encounter, particularly whether in an open public place within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor, and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects, such as tickets or identification; and whether they have specifically advised the defendant at any time that he had the right to terminate the encounter or refuse consent. *Mercado-Gracia*, 989 F.3d at 836. But no one factor is dispositive. *Id.* The focus remains on the coercive effect of police conduct, "taken as a whole on a reasonable person." *Id.* (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). Finally, the government bears the burden to prove consent. *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017).

Applying binding circuit precedent, Frantz's interaction with Lopez after performing the two-step was consensual. The totality of these circumstances indicate that a reasonable person would have felt free to leave after Frantz told them "you guys are good." Indeed, Lopez voluntarily *reengaged* Trooper Frantz in conversation after being told "you guys are good," mentioning that they wanted to go to a Subway. Doc. 41 at 4. After that short exchange, Trooper Frantz tells them to "take care" and waves. He then took six steps towards his patrol vehicle, reaching the rear of the Pacifica before turning back. Doc. 41 at 4–5. He approached the passenger window and asked Lopez and

16

Bautista if he could ask additional questions. Lopez responded, "Yeah, sure." Doc. 33 at 7. The whole time, Lopez and Bautista remained in the car and could have driven off. Frantz never restrained them or displayed a weapon to ensure they stayed in place. The factors in light of the totality of the circumstances indicate that the post-two-step encounter was consensual. *See, e.g.*, *United States v. Hunter*, 663 F.3d 1136, 1140, 1144–45 (10th Cir. 2011) ("[P]hrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart."); *Gomez-Arzate*, 981 F.3d at 843 (finding encounter was consensual where vehicle passenger remained with the driver throughout the encounter and witnessed the officer returning documents, issue a warning, and informing driver he was free to leave).

Lopez argues that a reasonable person would not have believed the stop was over after Frantz's "take care" comment. Lopez relies on *United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006). There, the Tenth Circuit found that a traffic stop turned into an unlawful detention because there was no evidence that Guerrero-Espinoza, a passenger and the owner of the vehicle, had witnessed any indication of the initial traffic stop's conclusion. *Id.* at 1309–10. Guerrero-Espinoza had remained in his vehicle while the trooper asked the driver to accompany him to his patrol car. *Id.* at 1305–06. Unbeknownst to Guerrero-Espinoza, the trooper issued the driver a warning while inside the patrol vehicle and told the driver he was free to leave. *Id.* But before the driver returned to Guerrero-Espinoza's vehicle, the trooper approached Guerrero-Espinoza and began to ask additional questions. *Id.* Suppression was required for all evidence obtained after the trooper started to question Guerrero-Espinoza because a reasonable person in his position would not have believed the traffic stop had ended. *Id.* at 1310.

But the *Guerrero-Espinoza* facts are inapposite here. *Contra* Doc. 33 at 18. Lopez argues that, like Guerrero-Espinoza, he had no reason to believe the traffic stop was over. *Id.* at 17–18. For example, Defendants point to Frantz's uniform and holstered service weapon. Frantz touched the vehicle on his initial approach. His additional questions came only about three seconds after ending the initial stop. And leaving the scene would have "require[d] the driver to essentially drive over a KHP Trooper to end the stop." *Id.* Not only are some of these

allegations counterfactual, *see* Doc. 41 at 18–19, or insignificant,[8] but Lopez's argument misses the key factor of *Guerrero-Espinoza*: Guerrero-Espinoza was not present for the trooper's closing remarks. 462 F.3d at 1309–10. Both Lopez and Bautista were present when Frantz communicated that they were free to leave and started retreating from the Pacifica. This was enough for a reasonable person to believe they were free to leave. *See, e.g.*, *Guerrero*, 472 F.3d at 789 (noting that an officer handing back papers, thanking defendant for his? time, and walking away is generally sufficient to indicate defendant is free to leave). Thus, the encounter after Frantz performed the "two-step" was consensual.

**2.** During this consensual encounter, Frantz observed *additional* facts that, in light of the totality of the circumstances and observations made during the first encounter, were enough to establish reasonable suspicion that Defendants were involved in criminal activity. In particular, Frantz learned of more uncertainty around Defendants' travel plans. Lopez told Frantz that they were going to visit his grandmother in Kansas City but—though they were only a few hours away—could not provide an address for her house. Doc. 33 at 7; Ex. 1 at 16:18–19:58; *see also Mendez*, 118 F.3d at 1431–32 (noting inability to provide destination address of relative contributed to reasonable suspicion). Also during this consensual encounter, Frantz noticed increased nervousness. Doc. 46 at 68. He testified that Lopez, the passenger, took over answering questions and that Bautista's legs "started to shake." *Id.* Bautista appeared "extremely worried about something" after having been told they could go. *Id.* Thus, even if the circumstances had not provided reasonable suspicion before, they did then.

## IV

For the reasons set forth above, Defendants' Joint Motion to Compel Discovery, Doc. 47, and Defendants' motions to suppress, Docs. 33 & 34, are DENIED.

It is so ordered.

---

[8] The touching of the van involved a slight tap on the rear hatch below the window. On cross-examination, Frantz explained that he was trained to do this so that if he happened to be shot on the side of the road, his DNA evidence would be on the vehicle. Doc. 46 at 89.

Date:  November 12, 2021        s/ Toby Crouse
                                Toby Crouse
                                United States District Judge